IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TOMMIE BRITTON,

    Plaintiff,

vs.                                            No. CIV 99-768 MV/KBM

LONG TERM DISABILITY
INSURANCE PLAN OF
THE LOVELACE INSTITUTES,
et al.

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment **[Doc. No. 20]**. The Court having considered the motion, briefs, relevant law and being otherwise fully informed finds that the Motion for Summary Judgment is not well taken and will be **DENIED.**

### FACTUAL BACKGROUND

The Court finds the following material facts to be undisputed:[1]

Plaintiff Tommie Britton was employed by Lovelace Institutes (Lovelace) from 1971 through 1996 as an administrative assistant and executive assistant to the corporate president and CEO. Northwestern Mutual Life Insurance Company (Northwestern) issued Group

---

[1] The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

1

Policy No. l652237 (policy) for long-term disability insurance to Lovelace effective January 1, 1992. Ms. Britton was a participant in the Northwestern Insurance Plan and as such was covered by the policy.

In 1994 Ms. Britton was diagnosed with fibromyalgia, a chronic pain syndrome which effects the fibrous tissues, muscles, tendons and ligaments.  The pain is aggravated by strain or overuse.  In addition, Ms. Britton has suffered from depression since childhood. Throughout 1995 and 1996, Ms. Britton was treated for her depression by a psychiatrist, Dr. Stellman.  In August, 1995 Ms. Britton was hospitalized for depression with a diagnoses of dysthymic disorder,[2] as well as fibromyalgia.  On December 7, 1995 Dr. Stellman diagnosed Ms. Britton as having "[dy]sthymtic disorder in addition to mood disorder *secondary to medical condition*." (emphasis added).  Ms. Britton's symptoms related to her depression and fibromyalgia fluctuated throughout 1995 and 1996, occasionally abating and then increasing in severity.  When discussing her depressive condition, Ms. Britton complained both of her chronic pain and of work related stress.

Ms. Britton's primary care physician, Dr. Rutschman, treated her fibromyalgia from 1994 to 1997.  On July 28, 1995, Dr. Rutschman noted that Ms. Britton experienced "less pain from fibrositis when not stressed."  On November 1, 1995, Dr. Rutschman indicated that Ms. Britton "has recently changed jobs and is much happier at her new job, however she has found an increase in pain upon simply returning to the stress at the workplace.  She is being followed for fibrositis.  She has recently been placed on Serzone by Dr. Stellman for treatment of depression."  Dr. Rutschman further observed that Ms. Britton's chronic depression suggested an underlying

---

[2] A disorder of mood, less severe than major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years.  Attorneys' Dictionary of Medicine (1994) at D-171.

personality disorder. From April 1996 through May 1996 Ms. Britton was treated by Dr. Rutschman for chronic headaches which he attributed to allergies, depression and fibromyalgia.

Ms. Britton's fibromyalgia took a turn for the worse after she suffered a bout of pneumonia in July, 1996. On July 27, 1996, Dr. Rutschman's chart note indicates that Ms. Britton

> has been having considerable difficulty at work, since her bout of pneumonia weakened her and exacerbated her myofascial pain syndrome....The effect of the pain is one of maintaining her attention constantly and making it quite difficulty [sic] to concentrate and perform....The work is not performed to her satisfaction, and she is suffering physically, as well as psychologically from the effort.

On September 24, 1996, Dr. Stellman noted Ms. Britton's increased mental stress as follows: "she states that she is being asked to do things at work that she simply cannot do. She feels that she is pushed too hard at work and with her new boss, there are threats of job cuts....she does not feel that she can afford to leave this job and therefore feels quite trapped." Dr. Stellman observed that Ms. Britton had both dysthymic disorder and an occupational problem. On September 30, 1996 Dr. Stellman noted that Ms. Britton had received a poor appraisal at work and complained that the thought of continuing work to be unbearable.

Ms. Britton's last day of active work at Lovelace was September 30, 1996. Ms. Britton was placed on 30 day sick leave. On her Family and Medical Leave Act form, Dr. Rutschman noted Ms. Britton as having longstanding fibromyalgia and that "her current state is complicated by depression." On October 7, 1996, Dr. Stellman reported that "The patient states she is feeling fragmented and irrational. However, since on medical leave, she is not crying constantly." On October 14, 1996, Dr. Rutschman saw Ms. Britton "to re-evaluate her cough." He noted that Ms. Britton's "fibrositis symptoms run unabated at this time. She has found that when she gets ill

3

her pain increases significantly, every bit as much as it does with other forms of stress."

On December 17, 1996, after being advised by Dr. Rutschman to not return to work, Ms. Britton applied for long term disability. Northwestern's Insurance Policy defines disability for employees in Ms. Britton's former position as follows:

> You are only required to be Disabled from your own occupation. You are Disabled from your own occupation if, as a result of Sickness, Accidental Bodily Injury or Pregnancy, you are EITHER:
>
> 1. Unable to perform with reasonable continuity the material duties of your own occupation; OR
> 2. Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own occupation.
>
> 5. The Policy further limits disability benefits as follows:
>
> 4. Mental Disorder: Payment of LTD Benefits is limited to 24 months for each period of Disability caused or contributed to by a Mental Disorder. Mental Disorder means: a mental, emotional or behavioral disorder.
>
> 6. The Policy requires that all claims for benefits must be submitted to Northwestern, and in relevant part, that [n]o [long-term disability] benefits will be paid unless Northwestern receives *satisfactory written proof:*
>    1. That [the claimant] became disabled while insured under the Group Policy. ...
>    3. That [the claimant's] Disability results from a cause not excluded in Part 7.

Part 10 E. of the Policy defined "satisfactory written proof" as

1. A completed claim statement signed by you.
2. A completed claim statement signed by the Policyowner.
3. A completed claim statement signed by your treating Physician.
4. Your written authorization for us to obtain the records and information needed to determine your eligibility for LTD Benefits.
5. Such other documents we may reasonably require.

Part 10 I. of Northwestern's Policy provided that when denying all or part of a claim, a

4

beneficiary will receive a written notice of denial containing:

    1.       The reasons for the denial;
    2.       Reference to the provisions of the Group Policy on which the denial is based;
    3.       A description of any additional information or documentation you must submit to obtain benefits; and an explanation of why such information or documentation is required.

On her Group Disability Claim Employee Statement, in answering the question, "how does your disability prevent you from working," Ms. Britton stated as follows:

> Daily migraine headaches with visual impairment. Overwhelming fatigue many days. Severe to moderately severe muscle pains - hands, shoulders/neck, feet, lower back. Intermittent debilitating depression due to constant pain.

On her Group Disability Claim Attending Physician Statement dated October 16, 1996, Dr. Stellman stated Ms. Britton's diagnosis as "major depression, recurrent," with symptoms being "persistent refractory depression, fatigue, tearfulness, loss of interest [and] poor concentration." Dr. Stellman further noted that Ms. Britton suffered "chronic pain symptoms for years." On his Group Claim Attending Physician Statement Dr. Rutschman diagnosed Ms. Britton's condition as "fibromyalgia" with symptoms including radiating pain from multiple trigger points, sleep disturbance, severe fatigue, frequent disabling headaches, and progressive depression. Dr. Rutschman also noted that Ms. Britton had a "[s]ignificant emotional or behavioral disorder such as depression, anxiety, hysteria." Dr. Rutschman further noted that Ms. Britton's "functional impairment is such that simple work activities exhaust her significantly, aggravating her situation." He finally stated that Ms. Britton is "unable to work without aggravating the fatigue and in the process the fibrositis pain" and "attempts to work have caused her to deteriorate." On January 10, 1997, Dr. Rutschman noted that

> [p]rior to a recent bought of pneumonia, [Ms. Britton] was functioning marginally at the work place due to her fibrositis, depression, and fatigue. This episode of pneumonia apparently put her over the edge. She had an exacerbation of the fibrositis, as well as developing fatigue, which has been prolonged and significantly more bothersome [than] it previously was.

On February 18, 1997, Northwestern forwarded Ms. Britton's medical file for review by Dr. Ronald Fraback, a board certified physician in Rheumatology and Internal Medicine who opined that while Ms. Britton had both fibromyalgia and depression

> [m]ost patients with fibromyalgia are able to work in a sedentary occupation. I do not think that the chart documents that the fibromyalgia should keep her from her usual occupation....It is my opinion that in the absence of any physical condition, the depression is of such severity as to preclude her from working at her usual position.

In March 1997 Northwestern informed Ms. Britton that after reviewing the records of Dr. Rutschman and the independent physician, Dr. Fraback, her claim for disability had been approved and that Northwestern had determined that the benefits were payable based on a mental disorder, which was subject to a 24 month limitation. Northwestern instructed Ms. Britton to submit "any information that would indicate that the mental disorder limitation provision should not be enforced." In response, Ms. Britton submitted an evaluation from Dr. Rutschman which opined that in Ms. Britton's case "[d]epression frequently accompanied chronic pain and...rather than being a disorder unto itself, it is the result of her underlying fibrositis (fibromyalgia)" Dr. Rutschman further observed that

> Chronic posturing, as Ms. Britton's job functions require (sitting at a desk, writing, looking down, or working at a computer) are significant triggers for activation of trigger points. Her condition is under better control when not exposed to work place triggers...[and]...the fibromyalgia is of sufficient severity to preclude her from continuing to work in this 'sedentary' occupation.

On April 14, 1997, Dr. Stellman stated that "Ms. Britton has long-term dysthymia which it

6

separate from her fibromyalgia. However, it is quite clear that as her fibromyalgia becomes more difficult for her to manage, there is a clear depressive reaction that...forms a combined disability." Dr. Stellman further noted that "her depressive symptoms are clearly reactive to the degree of physical distress she is in from her fibromyalgia." Northwestern forwarded these physical statements to Dr. Fraback who again concluded,

> I do not think that the records support that her depression is secondary to fibromyalgia....I do not think that fibromyalgia should keep her from doing a sedentary occupation. Generally patients with fibromyalgia are encouraged to remain active and work if at all possible.

On October 15, 1997, Plaintiff's new primary care physician, Dr. Zimmerman, notified Northwestern that "in [his] medical opinion...the depression that Ms. Britton suffers is a result of the fibromyalgia and the primary medical problem is fibromyalgia and that the depression is a secondary problem." He later observed that "with her increasing level of physical activity...she experiences more pain." Northwestern responded, on November 10, 1997, that according to Dr. Fraback the medical records did not document that Ms. Britton's fibromyalgia was such that it would disable her, but that her depression was in fact disabling. Northwestern informed Ms. Britton that they were forwarding her claim file to the Quality Assurance Unit for an independent review of Northwestern's determination and that she could submit any additional information she wanted considered in this review. Ms. Britton submitted a statement from Dr. Zimmerman diagnosing her with fibromyalgia, chronic pain, a potential for developing opiate tolerance and seasonal affective disorder. Blanche Sabo, a Northwestern employee in its Quality Assurance Unit, met with Dr. Fraback as part of the review. In this meeting, Dr. Fraback observed that the headaches, fatigue and depression experienced by Ms. Britton can be symptoms of disabling

fibromyalgia. Dr. Fraback informed Ms. Sabo that a "Rheumatology/Psych panel IME might help clarify ongoing level of impairment." Despite this recommendation, Northwestern did not instruct Ms. Britton to undergo a Rheumatology/Psych panel IME. On December 22, 1997 the Quality Assurance Unit informed Ms. Britton that the mental health limitation on her claim was to be upheld, concluding:

> when the medical records currently contained in Ms. Britton's claim file are considered collectively, it is reasonable to conclude that Ms. Britton's decompensation was due to her inability to successfully process her occupational stress. Consequently, her mental disorder caused or contributed to her current period of disability.

The review of Ms. Britton's file continued through 1998. On March 11, 1998 Dr. Zimmerman noted that fibromyalgia was Ms. Britton's "primary sickness or injury causing inability to work." On November 17, 1998, Dr. Bradley J. Fancher, a second independent physician consultant retained by Northwestern, reviewed Ms. Britton's file and stated "I agree with Dr. Fraback that individuals with [fibromyalgia] should be able to perform sedentary work. My experience is that patients with fibromyalgia are capable to doing light work." In February 1999 Northwestern again submitted Ms. Britton's file to the Quality Assurance Unit. On April 30, 1999 the Quality Assurance Unit informed Ms. Britton that they had reviewed her claim to "determine if there is adequate medical evidence and clinical findings to support that Ms. Britton is disabled from her own occupation solely because of a physical condition, not by a psychological one or a combination of both." The Quality Assurance Unit concluded,

> The medical records demonstrate the correlation between Ms. Britton's mental status and the severity of her reported physical symptoms; they corroborate that the higher the level of emotional stress that Ms. Britton experienced or exhibited, the more severe her fibromyalgia became....When fibromyalgia occurs in addition to depression, or is complicated by a mental disorder to the degree that an

8

>individual is rendered unable to routinely perform sedentary tasks, the severity of the symptoms of the physical condition is being *caused or contributed to by a mental disorder*....As the preponderance of the evidence in the file supports that Ms. Britton's disability remains caused or contributed to by a mental disorder(s), the determination to close her claim on December 29, 1998, at the end of the 24-month maximum benefit period, is correct and must be upheld.

## STANDARD OF REVIEW

The Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, comprehensively regulates employee welfare-benefit plans. An employee welfare-benefit plan is defined as one which provides to employees "Medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death," whether these benefits are provided "through the purchase of insurance or otherwise." 29 U.S.C. § 1002(1). Plans may self-insure or they may purchase insurance for their participants. ERISA establishes various uniform procedural standards concerning reporting, disclosure, and fiduciary responsibility but it does not regulate the substantive content of welfare-benefit plans. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983).

Selection of the proper standard of judicial review of a denial of benefits claim under 29 U.S.C. § 1132 (a)(1)(B) turns on the terms of the plan. Under ERISA, a court must review *de novo* a company's denial of benefits unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a court reviews a benefits denial under the narrower arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115. (1989); *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996). The Tenth Circuit has found that a plan grants discretionary authority to an administrator, giving rise to the arbitrary and capricious

standard of review, in the following instances:  when the plan language excluded from coverage procedures, which in the judgment of [the plan administrator] are experimental," *see Chambers*, 100 F.3d at 825; when the plan administrator had authority "to decide all questions" concerning application or provisions of the plan, *see Dycus v. Pension Benefit Guaranty Corp.*, 133 F.3d F.3d 1367, 1369 (10th Cir. 1998); and when an administrator "determines the benefits for which an individual qualifies under the Benefit Plan" and "the insurance company has the exclusive right to interpret provisions of the Plan and its decision is conclusive and binding," *see Winchester v. Prudential Life Ins.*, 975 F.2d 1479, 1483 (10th Cir. 1992).

In contrast, the Tenth Circuit had found a *de novo* standard of review applied in the following situations:  when a plan physician's exercise of medical judgment in determining an insured's eligibility for benefits was itself reviewed for an abuse of discretion; *see McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1200 (10th Cir. 1992); when the defendant claimed that a plan did grant discretion to the plan administrator to determine whether a claimant was "totally disabled" but denial was based on the requirement that the period of disability last for a certain length of time, which the defendant did not have discretion to determine, *see Hubbert v. Prudential Ins. Co. of America.*, 1997 WL 8854, at **2-4 (D. Colo. Jan. 10, 1997); and when a group policy plan required the company to pay "proceeds to the beneficiary of record," s*ee Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1118 (10th Cir. 1991).  *See also John Deere Health Benefit Plan v. Chubb*, 45 F. Supp. 2d 1131, 1137 (D. Kan. 1999) (assuming *de novo* standard, noting lack of guidance in Tenth Circuit).

Northwestern relies on a provision in the policy requiring  "satisfactory written proof of loss" to argue that the Policy grants it discretionary authority to which an arbitrary and capricious

standard should apply on review. Ms. Britton, on the other hand, argues that the presumption of *de novo* review applies because Northwestern is not granted any explicit discretion, the term "satisfactory written proof of loss" does not convey any discretion and any discretion Northwestern would have is limited by the provision which requires Northwestern to inform the participant what additional proof is required in order to obtain benefits. District courts in the Tenth Circuit are split on what standard of review should apply when a plan or policy requires proof of loss before the payment of benefits. Courts in the District of New Mexico and the District of Utah have held that the requirement that a participant must show proof of disability does not mean that the administrator's decision is afforded deference, and thus *de novo* review applies. *See LaPointe v. Continental Casualty Company*, slip op., Civ. No. 99-1358 (D.N.M. April 14, 2000); *Lund v. UNUM Life Ins. Co.*, 19 F. Supp.2d 1254, 1258 (D. Utah 1998). The District of Kansas has held to the contrary that when a participant must supply proof of disability, an arbitrary and capricious standard applies on review. *See Riley v. UNUM Life Ins. Co. of N. Am.*, 959 F. Supp 1361, 1365-66 (D. Kan. 1997). Courts outside of this circuit are similarly split. Some have found proof provisions sufficient for a grant of discretion. *See, e.g., Perez v. Aetna Life Ins. Co,* 150 F.3d 550, 555-57 (6th Cir. 1998) (finding discretion based on requirement of written "proof" of disability sufficient to overcome presumption of *de novo* review); *Fitts v. Federal National Mortgage Ass'n*, 77 F. Supp. 2d 9 (D.D.C 1999) (same). Other courts have found that "proof" provisions do not grant sufficient discretion to overcome presumption of *de novo* review. *See Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 332 (7th Cir. 2000) (mere fact that a plan requires proof or satisfactory proof insufficient to defeat de novo presumption); *Kinstler v. First Reliance Standard Life Ins.*, 181 F.3d 243 (2nd Cir. 1999) (same); *Kearney v.*

*Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) (same); *Brown v. Seitz Foods, Inc. Disability Benefits Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (same).

      The weight of authority in these analogous cases suggest that the mere requirement of "satisfactory proof of loss" is insufficient to overcome the application of the *de novo* standard of review. First, although the Tenth Circuit does not require explicit language granting discretion to the plan administrator, the case law suggests that more definite grants of discretion are necessary to apply the arbitrary and capricious standard of review. *See, e.g., Pitman v. Blue Cross/ Blue Shield of Oklahoma*, 217 F.3d 1291 (10th Cir. 2000) (arbitrary and capricious standard applies where administrator "is authorized to determine, and in its discretion, to alter the Benefits provided by this Contract"); *Dycus*, 133 F.3d at 1369 (noting that plan administrator had authority to decide all questions); *Wincheste*r, 975 F.2d at 1483 (noting administrator could determine benefits and that insurance company had exclusive right to conclusively interpret Plan). Those decisions applying *de novo* standard of review in ERISA cases are better reasoned and more in line with Supreme Court precedent. A policy which requires a participant to prove in writing her disability suggests nothing more than prudent record-keeping practices on the part of the administrator. Moreover, to allow an insurance company to escape *de novo* review by utilizing vague and inexplicit discretion-reserving language would erode the principle recognized in *Firestone* that Congress enacted ERISA to promote employee interests. Allowing a vague provision such as "satisfactory proof of loss" to gut the *de novo* rule established in *Firestone* would create a broad exception to the *de novo* presumption based on discretion which has not been clearly reserved by the insurer. In *Bogue v. Ampe Corp*, 976 F.2d 1319, 1324 (9th Cir. 1992) (Wisdom, J., sitting by designation) the Ninth Circuit interpreted a policy phrase stating

12

that a claims "determination...will be made by" the employer/plan administrator to grant discretion to that employer for *Firestone* standard of review purposes. Judge Wisdom observed that to find a grant of discretion from more equivocal language would undermine Congressional intent:

> We do not want to encourage an employer to insulate himself from effective appellate review through the abuse of vague phrases that fail to make clear to the employees that the employer will have the final determination of benefit decisions. Employees who lose promised benefits should not lose the additional benefit of judicial review because their employer reserved discretionary power to itself without making that reservation clear.

*Id*. at 1235.

The same principles apply in this case. Viewing the insurance policy as a whole, the Court is not persuaded that Northwestern retained sufficient discretion to deny benefits such that would rebut the presumption of *de novo* review. Although the policy is modified somewhat by the subjective nature of the term "*satisfactory* written proof of loss," nothing in the policy gives Northwestern the discretion to reject medical findings provided by a participant's doctors, or otherwise use its own discretionary judgment as a substitute for the proof of loss provided by the participant. Rather, the term "satisfactory written proof of loss" is defined only relative to what type and what amount of documentation is required and does not impart any discretion upon Northwestern to make a qualitative assessment of whether it agreed with the documentation provided. The Court's position is bolstered by the provision in the Policy which required the administrator to inform the participant of what further information was required in order to secure benefits. This provision limited the administrator's discretion and operated to assure the participant of the entitlement to benefits. Accordingly, the *de novo* standard of review will apply.

Under both the *de novo* and the arbitrary and capricious standard, the reviewing court may consider only the evidence that was before the administrator at the time of its final decision. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818 (10th Cir. 1996); *Caldwell v. Life Insurance Co. of North America*, 165 F.R.D. 633, 636-37 (D. Kan. 1996). In interpreting the terms of an ERISA plan under the *de novo s*tandard, the court gives "the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996). When a court reviews an administrator's denial of benefits *de novo*, it simply decides whether the decision under review was correct. *See Hammers v. Aetna*, 962 F. Supp 1402, 1405 (D. Kan. 1997); *Caldwell*, 165 F.R.D. at 637.

## DISCUSSION

It is undisputed that Ms. Britton has fibromyalgia. Rather, the dispute between the parties is whether Northwestern correctly decided that Ms. Britton had not provided satisfactory written proof that her fibromyalgia was of sufficient severity to prevent her from working, and whether Northwestern correctly interpreted Ms. Britton's condition to fall under the mental health limitation of long term disability benefits. The Court finds that Northwestern was erroneous in both these determinations.

Northwestern based its denial of Ms. Britton's long-term disability in part on its conclusion that Ms. Britton had not provided satisfactory proof that her fibromyalgia in and of itself was of sufficient severity to prevent her from working in her occupation. This conclusion does not conform to the documentation offered by Ms. Britton to Northwestern. Ms. Britton provided several physician statements attesting that her fibromyalgia was so severe that she could

14

not continue working.  On November 1, 1995, Dr. Rutschman indicated that although Ms. Britton was happy at her job she found an "increase in pain upon simply returning to the stress at the workplace."  On July 27, 1996, Dr. Rutschman's chart note indicates that Ms. Britton "has been having considerable difficulty at work, since her bout of pneumonia weakened her and exacerbated her myofascial pain syndrome....The effect of the pain is one of maintaining her attention constantly and making it quite difficulty [sic] to concentrate and perform...."  On his Group Claim Attending Physician Statement Dr. Rutschman diagnosed Ms. Britton's condition as "fibromyalgia" with symptoms including radiating pain from multiple trigger points, sleep disturbance, severe fatigue, frequent disabling headaches, and progressive depression.  Dr. Rutschman elaborated that Ms. Britton's "functional impairment is such that simple work activities exhaust her significantly."  In March, 1997 Dr. Rutschman informed Northwestern that "[c]hronic posturing, as Ms. Britton's job functions require (sitting at a desk, writing, looking down, or working at a computer) are significant triggers for activation of trigger points."  He elaborated that her "condition is under better control when not exposed to work place triggers...[and]...the fibromyalgia is of sufficient severity to preclude her from continuing to work in this 'sedentary' occupation."  On October 15, 1997, Ms. Britton's new primary care physician, Dr. Zimmerman, notified Northwestern that Ms. Britton suffered primarily from fibromyalgia and "with her increasing level of physical activity...she experiences more pain."  On March 11, 1998, Dr. Zimmerman noted that fibromyalgia was Ms. Britton's primary sickness or injury "causing inability to work."  This ample evidence taken together clearly demonstrates that Ms. Britton's inability to work arose from the chronic pain associated with her fibromyalgia.   However, rather than considering this documentation to be "satisfactory written proof of loss," Northwestern

15

disregarded these medical opinions and instead placed more weight on the medical opinion of Dr. Fraback, the independent physician who after reviewing Ms. Britton's medical file, concluded that "most patients with fibromyalgia are able to work in a sedentary occupation. I do not think that the chart documents that the fibromyalgia should keep her from her usual occupation...It is my opinion that in the absence of any physical condition, the depression is of such severity as to preclude her from working at her usual position." Although it is conceded that Ms. Britton suffered from depression, it is equally clear that her battle with depression was a lifelong struggle that had never prevented her from working. The Court is quite perplexed that in the face of several statements from Dr. Rutschman and Dr. Zimmerman that Ms. Britton's fibromyalgia was of sufficient severity to prevent continued employment, Northwestern found it more appropriate to rely on the conclusion of Dr. Fraback that "the chart [does not] document that the fibromyalgia should keep her from her usual occupation." Nothing in the Policy gave Northwestern such discretion to substitute its own doctor's medical opinion for those of the participant's doctors. Moreover, it is clear that Dr. Fraback based his conclusion in part on his opinion that fibromyalgia does not generally keep people from working in sedentary positions, rather than considering the individual circumstances of Ms. Britton. Northwestern was obliged under the terms of the insurance policy to consider Ms. Britton's condition individually, rather than on the general experiences of most fibromyalgia patients. The Court is further unpersuaded by Northwestern's reliance on the opinion of a physician who examined only Ms. Britton's medical file, rather than on the opinions of two physicians who examined Ms. Britton in person and benefitted from their personal observations of her condition. Northwestern's conclusion is further undermined by the fact that Dr. Fraback conceded that all the symptoms suffered by Ms. Britton, including

16

headaches, fatigue and depression could indeed be evidence of a disabling case of fibromyalgia. In addition, Dr. Fraback suggested to Northwestern that a "Rheumatology/Psych panel IME might help clarify ongoing level of impairment." Despite this recommendation, Northwestern did not instruct Ms. Britton to undergo such an evaluation in contravention of the provision requiring Northwestern to inform Ms. Britton what additional documentation was necessary to obtain her benefits. The totality of the evidence suggests that Northwestern chose to ignore the significant documentation proving that Ms. Britton's fibromyalgia was of sufficient severity to preclude her from continuing her employment in violation of its obligations under the Policy.

The Court also finds that Northwestern erroneously applied the mental health limitation to Ms. Britton where the evidence suggested that her depression was a symptom of her fibromyalgia and was aggravated by her physical condition. Northwestern's view was that the mental health limitation applied because her disability was "caused by or contributed to by a mental disorder." The evidence is clear in this case that Ms. Britton had long suffered from depression without limiting her ability to work. The evidence also shows that depression is a symptom of the chronic pain disorder. Dr. Stellman, Ms. Britton's psychiatrist, repeatedly informed Northwestern that Ms. Britton's depression was secondary to her physical condition and was in fact aggravated by her physical condition. Nonetheless, Northwestern chose to view the depression as an aggravating factor of her physical condition, rather than the physical condition aggravating her depression. The Ninth and Seventh Circuits have confronted similar issues and have found that the term "mental illness" should be interpreted to refer only to illnesses with non-physical causes rather than illnesses with physical causes, but exhibiting both physical and non-physical symptoms. *See Lang v. Longterm Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d

794, 797 (9th Cir. 1997); *Philips v. Lincoln Nat. Life Ins. Co.,* 978 F.2d 302 (7th Cir. 1992). In this case, the Court is confronted with a similar ambiguity in the terms of Northwestern's insurance plan. Northwestern's Policy defines the phrase "mental disorder" simply as a mental, behavioral or emotional disorder." It does not discuss whether the phrase "mental disorder" should include including mental conditions or symptoms secondary to "physical disorders." Nonetheless, Northwestern in reviewing Ms. Britton's claim, concluded that when "fibromyalgia occurs in addition to depression, or is complicated by a mental disorder to the degree that an individual is rendered unable to routinely perform sedentary tasks, the severity of the symptoms of the physical condition is being *caused or contributed to by a mental disorder.*" Ambiguities in ordinary insurance contracts are construed against the insurance company. The rule, known as the doctrine of *contra proferentem*, applies in ERISA cases where the Court applies a *de novo* standard of review. *See Kimbor v. Thiokal Corp.*, 196 F.3d 1092,1100 (10th Cir. 1999) (citing cases holding that the doctrine of *contra proferentem* applies in ERISA cases where *de novo* review is used). The doctrine of *contra proferentem* in this case requires the Court to adopt the reasonable interpretation advanced by Ms. Britton, *i.e.*, that the phrase "mental disorder" does not include "mental" conditions resulting from or aggravated by "physical" disorders. *See also Lang*, 125 F.3d at 797; *Philips,* 978 F.2d 302.

On these grounds the Court finds that Northwestern erred when it concluded that Ms. Britton had not provided satisfactory proof that her fibromyalgia prevented her from continued employment, and when it concluded that a mental disorder includes those conditions which are caused by or aggravated by a physical condition. The Court further finds that Northwestern incorrectly applied the mental health limitation to Ms. Britton's long term disability claim.

18

## CONCLUSION

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Defendant Northwestern's Motion for Summary Judgment **[Doc. No. 20]** is **DENIED.**

**DATED** this 23rd day of August, 2000.

                                                                    _____
                                                                    MARTHA VAZQUEZ
                                                                    U. S. DISTRICT COURT JUDGE


Attorney for Plaintiff
Earl Norris

Attorney for Defendant
Robert St. John